Filed 2/3/21  In re C.H. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.H., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>S.M.,<br><br>　　Objector and Appellant. | A159444<br><br>(Contra Costa County Super. Ct. No. J1600879) |

　　　　S.M. (mother) appeals a juvenile court judgment terminating her parental rights to her son C.H. and choosing adoption as the appropriate permanent plan.  (Welf. & Inst.Code, § 366.26.)[1]  Mother challenges this order based on the beneficial parent-child relationship exception to the adoption preference. (§ 366.26, subd. (c)(1)(B)(i).)  We affirm the judgment.

---

　　　　[1] Further references are to the Welfare and Institutions Code.

1

## I.  BACKGROUND

In September 2016, mother (who was then 17 years old) was in an abusive relationship with C.H., Sr., who at that time was believed to be the father of her two-month-old son C.H. Mother was a client of the Regional Center, due to a mild intellectual disability that caused her to be easily influenced.

On September 19, 2016, mother took C.H. to the hospital emergency room, where he was found to have two broken arms and abdominal bruising.  During subsequent genetic testing (which was negative for brittle or easily broken bones) he was found to have suffered four episodes of trauma.  Mother suspected C.H., Sr. of causing the injuries, but told inconsistent stories about the events leading to C.H. being taken to the hospital.  Both mother and C.H., Sr. became suspects in an investigation into the cause of C.H.'s injuries, but the police declined to prosecute either of them for lack of sufficient evidence.

C.H. was detained outside of mother's custody and respondent Contra Costa County Children and Family Services Bureau (Bureau) filed a petition alleging that C.H. was a dependent child of the juvenile court under several subdivisions of section 300.  On December 9, 2016, the court found C.H. had suffered severe, non-accidental physical injuries under section 300, subdivision (a) while in mother's care.[2]  At a dispositional

---

[2] A paternity test subsequently determined that C.H., Sr. was not C.H.'s biological father.  C.H., Sr. decided he did not want to be included in C.H.'s life or in this case, and although he

2

hearing on February 3, 2017, he was declared a dependent child and removed from mother's custody. Mother was granted monitored visitation and reunification services that required her to undergo a parental competency assessment.

C.H. was placed in a foster home in which both foster parents were nurses. He was diagnosed with post-traumatic stress disorder (PTSD) and had several behavioral issues (dissociative freezing stares, self-harm from scratching and pulling hair, sleeping and eating disorders) as a result. These behaviors greatly improved with the efforts of the foster parents.

The supervised visits went well overall, and the parties agreed that mother loved C.H. Mother had participated in parenting classes, CPR classes and support groups. But there were concerns about her ability to keep C.H. safe if he were returned, given the circumstances of his original injuries, mother's intellectual limitations, and the fact that mother's close family members (who would be in the picture if C.H. were returned to mother) seemed to be in denial about the nature and severity of C.H.'s injuries.

A six-month review hearing was held January 3, 2018, and the court found that given the delay in finding someone to perform the parental competency evaluation, reasonable services had not been provided to mother. Mother's supervised visitation and reunification services were continued. The visits continued

---

was named in the petition, no findings were ultimately made as to him.

3

to go well, although C.H. generally took some time to warm up to mother.

A parenting competency evaluation prepared by David Brodzinsky, Ph.D., reported that mother was no longer in a relationship with C.H., Sr., and had no intention of letting him back into her life. Mother was "warm, loving and respectful" during her visits with C.H., and although C.H. initially resisted her attentions, he played with her and appeared to enjoy their time together. Dr. Brodzinsky concluded, "[Mother] is an emotionally vulnerable woman, with somewhat limited intellectual functioning, but in my professional opinion, she is competent to parent her son, with the caveat that a support system be put into place that can provide her with the daily help she will need to meet her son's needs. . . . Without this type of support, I am concerned that [mother]'s level of stress would exceed her capacity to cope, putting her at risk for parenting failure and [C.H.] at risk for inadequate care." He recommended that mother live with an adult approved by Bureau who could provide emotional and practical help and guidance. He noted that mother admitted needing help in rearing her son.

On July 20, 2018, the court held a combined 12-month and 18-month review hearing. By that time, mother was living at a regional center independent living placement. The court set the case for a 24-month review hearing after finding that mother had made significant progress in resolving the problems that had led to C.H.'s removal from her home and that it was substantially probable he would be returned to her care if services were

4

extended, provided that mother continue to reside in her regional center placement.

A 24-month review hearing was held February 25, 2019, at which time the court terminated reunification services and set the matter for a permanency hearing under section 366.26. The social worker's report prepared for this hearing recognized that mother was still living in her regional center placement and received support largely in the form of transportation, visit supervision, and parenting advice, and that "loosely supervised" visitation had begun a few months earlier. A therapist was providing weekly dyadic therapy where mother and C.H. participated in therapy together, although mother refused to participate in individual therapy. But mother could not safely parent C.H. without full time support, and the level of supervision at mother's regional center placement did not provide the amount of support and supervision necessary to ensure mother would not put C.H. at risk as a full-time care provider.

A contested hearing under section 366.26 was held December 11, 2019. The court denied a motion for modification filed by mother under section 388 to obtain additional services based on her having secured full-time employment at a senior center as well as her continued personal growth. It then found C.H. was adoptable (specifically adoptable to the caregivers if not generally adoptable) and that no exception to adoption existed.

C.H.'s foster parents, who had cared for him throughout the dependency, were identified as the prospective adoptive parents.[3]

## II. DISCUSSION

Mother argues that the judgment terminating her parental rights to C.H. must be reversed because the quality of her relationship with him would make it detrimental to sever their relationship. We reject the claim.

At a hearing under section 366.26, the court may order one of three alternative plans: adoption (necessitating the termination of parental rights), guardianship, or long-term foster care. (§ 366.26, subd. (b)(1)–(6).) If the child is adoptable, there is a strong preference for adoption over the other alternatives. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297 (*S.B.*).) Once the court determines the child is adoptable, a parent seeking a less restrictive plan has the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1). (*S.B.*, at p. 297; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

Section 366.26, subdivision (c)(1)(B)(i) provides for one such exception when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The "benefit" necessary to trigger

---

[3] Although the foster parents were lauded by the court and counsel throughout most of this case for the excellent care and attention they gave to C.H., there were two referrals regarding other children in the home and the foster father initially failed to complete diversion in a case that impeded the family's approval to adopt. These issues were resolved and are not before us on appeal.

6

this exception has been judicially construed to mean, "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); see also *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347 (*Jasmine D.*).)

Appellate courts are divided over the appropriate standard of review to apply to this finding. Substantial evidence, abuse of discretion or a combination of both have been employed. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 (*K.P.*).) Both the substantial evidence and abuse of discretion standards require deference to the trial judge and the practical differences "are not significant." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We would reach the same result under either or both. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, & fn. 7 (*G.B.*).)[4]

---

[4] The issue of which standard of review is appropriate is currently pending in the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.

The trial court did not err in determining that mother had not carried her burden of proving the beneficial parental relationship exception. The evidence did not suggest, much less compel, a finding that C.H. would be greatly harmed by a termination of mother's rights. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Except for the first two months of his life, after C.H. was removed from her custody due to unexplained severe physical injuries, mother was not his caregiver. Visits with her were supervised for the duration of the dependency, although they were "loosely" supervised at the end, and C.H. needed time to "warm up" to mother during the visits. C.H. had one true attachment, to his foster parents who had cared for him for all but the first two months of his life (he was three and a half years old by the time of the hearing under section 366.26). " '[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

That C.H. appeared to enjoy his time with mother does not require a different result. The beneficial parental relationship exception requires more than a showing that the parent and child have a friendly and loving relationship. (See *In re Brian R.* (1991) 2 Cal.App.4th 904, 924; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 (*Beatrice M.*).) " 'Interaction between [a] natural parent and child will always confer some incidental benefit to the child[,]' " but the beneficial relationship exception

8

contemplates that the parents have "occupied a parental role." (*Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.) While mother's visits with C.H. were positive, her relationship with him cannot reasonably be described as parental in nature.

As a young child with significant special needs, resulting in large part from behaviors caused by PTSD, C.H.'s interest in permanency and stability is particularly acute. He was in a secure placement and was bonded with his caregivers and prospective adoptive parents. The juvenile court could reasonably conclude C.H.'s relationship to mother did not outweigh that interest.

Mother suggests that a different result is required by *S.B.*, *supra*, 164 Cal.App.4th at p. 299, because the parental relationship exception does not turn on whether a child has a "primary attachment" to the parent. In that case, in which the court found there was no substantial evidence to support the trial court's ruling that the parental relationship exception did not apply, the circumstances were considerably different. The father had been the minor's primary caretaker for three years. (*Id.* at p. 298.) She was removed from his custody due to his methamphetamine use and placed with her grandmother, but the visits with father went well and the minor exhibited a strong attachment to him. (*Id.* at p. 293.) Under these circumstances, the court noted that it was unnecessary for the minor to view father as her " 'primary attachment' " for the beneficial parental relationship exception to apply. (*Id.* at p. 299.)

9

The same appellate court that decided *S.B.* subsequently stated in another case: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) The same court reiterated the exceptional nature of the *S.B.* decision in *In re C.F.* (2011) 193 Cal.App.4th 549, 559, stating: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact. . . . [C]ontact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard."

Like the trial court, we have no doubt that mother loved C.H. and that their time together was beneficial to him. But that does not mean it was so beneficial as to outweigh the benefits of adoption, and it did not render mother's relationship to C.H. "parental." The court did not err in determining that the parental relationship exception did not apply,

### III. DISPOSITION

The judgment is affirmed.

10

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P.J.

_____

SELIGMAN, J. *

*In re C.H.* / A159444

_____

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.